## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN HASTINGS, Individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>NIFTY GATEWAY, LLC and THE GEMINI TRUST COMPANY, LLC,<br>　　　　　　　　Defendants. | Civil File Action No. 1:22-cv-10517<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, on behalf of himself and all others similarly situated, files this Complaint ("Complaint") against Defendants Gemini Trust Company, LLC ("Gemini") and Nifty Gateway, LLC ("Defendants"). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases, media reports, websites, and other publicly available reports and information about the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiff hereby alleges as follows:

### **INTRODUCTION**

1.　　Defendants own and operate a platform called Nifty Gateway that promotes, offers, and sells securities known as "Nifties" throughout the United States in violation of the federal securities laws.

2.      Nifties sold by Defendants are non-fungible tokens, or NFTs.  NFTs are a form of digital assets that can be bought, sold, and exchanged on proprietary trading platforms.  Defendants focus their Nifties on digital artwork and curated collections.  No matter the visual difference among individual tokens, at their core, Nifties are NFTs.

3.      NFTs exist on a "blockchain," which is essentially a decentralized ledger that records digital asset transactions.  Assets on the blockchain are referred to as "crypto assets." There are various kinds of crypto assets in existence, and among the most well-known are Bitcoin and Ethereum.

4.      Any digital asset, including an NFT, can be classified by securities regulators as a "security."

5.      Certain types of digital assets derive their value from the success or failure of a given project, promoter, or startup.  Investors purchase this type of digital asset with the hope that its value will increase in the future as the project grows in popularity, based upon the managerial efforts of the issuer and those working to develop the project.  Because this type of digital asset is properly classified as a security under federal law, the issuers of this type of crypto assets, including Defendants, are required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"), and comply with federal securities laws.  Defendants knew of these requirements, but nonetheless failed to comply.  By selling these unregistered securities to investors, Defendants reaped hundreds of millions of dollars in profits.

6.      On the date of the release for each respective Nifty, Plaintiff purchased ten (10) Nifties on the Nifty Gateway Platform, using United States Dollars to make the purchase.

7.      Specifically, Plaintiff purchased the Nifties: Liplet #247/269 (released February 23, 2021), The Ecstasy of Crypto 2 – Bitcoin Edition #331/538 (released March 14, 2021), SATOSHI

#124 and #299/358 (released March 15, 2021), I have overcome #65/90 (released March 15, 2021), T4: Moscow #6/25 (released March 24, 2021), T1: Rome #170/200 (released March 24, 2021), G4: Mexico City #12/18 (released March 24, 2021), Trance #25/41 (released March 25 2021), and Without You #42/102 (released April 2, 2021).

8.      All Nifties purchased by Plaintiff were offered, promoted, and published by Nifty Gateway Curated, a storefront operated and managed by a specialized team at Nifty Gateway.

9.      Plaintiff relied on Nifty Gateway and their efforts to make his Nifties more valuable.

10.     As a result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to evaluate the risks associated with their investment in Nifties and were denied the information that would have been contained in the materials required for the registration of the Nifties—have suffered significant damages.

## PARTIES

11.     Plaintiff John Hastings is a resident of Celina, Texas.  Plaintiff and members of the Class purchased unregistered Nifty securities from Defendants during the Class Period.

12.     Defendant Gemini is a New York chartered limited liability trust company based in New York, New York with its principal place of business at 600 3rd Avenue 2nd Floor New York, New York 10016 and its address for service of process at 28 Liberty Street, New York, NY 10005.  Gemini is a blockchain focused technology company that specializes in cryptocurrency funds and management.  Gemini owns and operates Nifty Gateway, a global NFT trading exchange. Gemini provides Nifty Gateway with its state of the art custodial services and wallet system.

13.     Defendant Nifty Gateway is a Delaware limited liability company with its headquarters also at 600 3rd Avenue 2nd Floor New York, New York 10016 with its address for service of process, likewise, at 28 Liberty Street, New York, NY 10005.  Nifty Gateway is a wholly owned subsidiary of Gemini and a global NFT trading Platform.  Through Nifty Gateway, investors can buy, sell, and trade Nifties worldwide.

## JURISDICTION AND VENUE

14.     The claims alleged herein arise under Sections 5 and 12(a)(1) of the Securities Act of 1933, 15 U.S.C. §§77e, 77*l*(a), 77o, and this Court has original subject matter jurisdiction of these claims.

15.     This case is appropriate for Federal Court under Federal Question Jurisdiction.  The claims contained herein arise under the Federal Securities laws and are thus proper for adjudication by the Federal courts.  All claims under federal and state law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

16.     Further, this Court has supplemental jurisdiction over the non-federal claims under 28 U.S.C. § 1367(a).

17.     The Court may exercise personal jurisdiction over the Defendants because Defendants conduct business in this District.  Defendants market, distribute, offer and sell Nifties throughout the United States, across state lines, and internationally.  Moreover, Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.

18.     Finally, venue is proper in this District pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.  Venue is also proper in this District because a substantial part of the events or

omissions giving rise to Plaintiff's claims occurred in the Southern District of New York. Defendants also transact business and are found within the Southern District of New York.

## BACKGROUND

### *Non-Fungible Tokens ("NFTs")*

19.     NFT stands for "nonfungible token" and is a digital certificate of ownership built on blockchain technology.  Fungibility is an economics term that describes the interchangeability of certain goods.  For example, a barrel of oil is fungible (interchangeable) with any other barrel of oil.  A dollar bill, likewise, is equal to any other dollar bill (or 4 quarters, etc.).  Non-fungible is to render such items unique or distinguishable.  Non-fungible tokens are unique, digital representations of assets living on a blockchain.  Because they are "nonfungible," NFTs are theoretically unexchangeable with another thing of equal value.  While NFTs are often referred to as "unique," this is quite deceptive.  In reality, the only unique aspect of NFTs on a broad scale are the unique identifiers and data used to record the asset on the blockchain.  They are unique in the way a serial number on a dollar bill, or a stock certificate is unique.  The visual appearance of an NFT bears no weight on its cryptographic "uniqueness."

20.     Defendants present Nifties as if they are unique works of art and compare their business model to art galleries.  However, this too is deceptive. As described above, a single NFT can be recreated en mass as many times as desired.  Therefore, the only "unique" aspect of Nifties is the code and data used to record the asset.  Despite Defendant's continued attempts to present their product in a different light, it remains functionally identical to other crypto assets and most importantly, as a result, functions as a security in the same manner in which consumers invest.

21.     In order for an NFT to exist, it must first be "**minted**" and uploaded onto the blockchain.  "Minting" is a term used to describe the process of establishing an NFT's creation on

the blockchain.  The minting process requires immense amounts of electricity, time, computational power, and labor to accomplish.  Individuals who want to create their own NFT independently have a laundry list of hurdles to overcome.  First, they must create the art they wish to mint.  Next, the art must be transformed into data that can be placed on the blockchain.  Because minting an NFT and placing it on the blockchain is so laborious, individuals are encouraged to seek out exchange platforms to do so for them—like Nifty Gateway.  Since placing an NFT on the blockchain requires interaction with it, creators must pay the platforms transaction fees in cryptocurrency, usually in a proprietary currency on the blockchain.  These transaction fees are called "**gas fees**" and are used to cover the cost of powering the blockchain.

22.     In 2018, Nifty Gateway launched, providing a platform for buying, selling, owning, and trading, digital art online— called "Nifties."

23.     Soon after in early 2019, NBA Moments appeared on the NBA Top Shot platform—sparking a mania around the trading market of the NFTs.  A Moment depicting LeBron James dunking sold for more than $200,000 on the NBA Top Shot platform's exchange.  Notably, there is a case pending in the Southern District of New York entitled *Friel v. Dapper Labs*, 1:21-cv-05837-VM (S.D.N.Y. Oct. 8, 2021), in which a class of plaintiffs similarly claim to have been sold unregistered securities from the NBA Top Shot platform.

### *Nifty Gateway Platform*

24.     Nifty Gateway launched in 2018 by Duncan and Griffin Cock Foster with the stated mission of making digital art easily accessible to everyone.

25.     Nifty Gateway was acquired by Defendant Gemini in late 2019 and rose to popularity in 2020 as one of the top marketplace exchanges to buy, sell, trade, and own NFTs, or "Nifties." Their slogan is that they "will not rest until 1 billion people are collecting nifties."

26.     Users do not need any type of crypto wallet to use the Nifty Gateway platform (hereinafter the "NGP," the "Nifty Gateway Platform" or the "Platform").  Users can purportedly buy, sell, and collect Nifties on the Platform while avoiding expensive gas fees, thanks to the Gemini portfolio's established trust, security, and storage capabilities.

27.     Nifties are stored in user accounts using Gemini's custodial technology, and can be collected, displayed, or traded therefrom.  Users who wish to remove their Nifties from the Nifty Gateway Platform and transfer to an alternative wallet or storage, however, must pay fees to do so.

28.     When buying and selling NFTs on an exchange, the amount of gas fees depends on both the complexity and demand at the time of transaction.  Nifty Gateway represents that "transactions on-platform don't incur gas!" This is because NFTs on the Nifty Gateway Platform are stored in the "Nifty Gateway Omnibus wallet…powered by Gemini's state-of-the-art custody technology.  This Omnibus wallet is a master holding account used for the purpose of transferring NFTs on to Nifty Gateway and moving them within [the] platform.  The custodial nature of this system allows for movement without having to process a transaction on the blockchain…"  Accordingly, it appears that Nifty Gateway interacts with the blockchain, and thus incurs gas fees, only when creating Nifties or when removing them from the Nifty Gateway Platform.

29.     Beyond operating and maintaining the Platform, Nifty Gateway also facilitates minting, or publishing, NFTs through their Platform.

30.     When publishing on the Platform, Nifty Gateway mints the work into an NFT, creating a digital asset that is recorded on Nifty Gateway's internal ledger and ultimately on the blockchain.  This process also creates the beginning of the permanent record associated with the

NFT, as well as all ownership, transfers, and prices.  Through this process, individuals can have their NFTs published while avoiding the laborious minting process as discussed above.

31.     Not only does Nifty Gateway facilitate the publication and sale of Nifties through their Platform, but it also provides curated drops under the storefront "Nifty Gateway Curated." There, "Nifty Gateway teams up with top artists and brands to create collections of limited editions, high quality NFTs, exclusively available on [the Nifty Gateway] platform."  Nifty Gateway curates these collections through collaboration with top artists—both digital and otherwise.

32.     The Nifty Gateway team specifically curates these drops—and only top-tier qualified NFT Artists vetted by Nifty Gateway and through a Nifty Gateway application and interview process may publish their Nifties on the Platform.  NFTs drop from the Nifty Gateway Curated page every couple of days, with volumes ranging from as small as $299 to as large as $107,000 in the span one week. In order to participate, investors must create an account with Nifty Gateway.  After sold on the primary market, Nifties can trade easily in the secondary market which is also created, maintained, and controlled by Nifty Gateway.  Thus, there is the very real prospect of acquiring Nifties in limited drops and then re-selling for a huge profit in the secondary market, or even buying in the secondary and reselling in the same market for more.

33.     Throughout this entire process, Nifty Gateway receives an interest in the sale of these Nifties both on the primary and secondary markets.  Per their Publisher Agreement, Nifty Gateway receives 10% of the proceeds arising from each sale on the primary market and up to 5% of the proceeds from sales on the secondary market.

34.     Additionally, the Publisher Agreement explicitly states in the terms on licensing, that Nifty Gateway retains the rights, and is required to, promote the published Nifties on the Platform.

30.     Furthermore, under Gemini's Custodial Fee Schedule, investors must pay a cash-out fee when they try to transfer their assets off of the Nifty Gateway Platform and likewise out of Gemini's Custodial Services. Under the Custody Agreement and Terms of Use, Gemini receives fees and payments for their Custody Services.

35.     In addition to being Nifty Gateway's parent company, Gemini Trust is also a publisher on the Platform and has a volume of $3.2 Million with only three (3) drops.  Gemini's drops almost exclusively consist of Awkward Astronaut Nifties.

### *Gemini Trust Company, LLC*

31.     Gemini was founded in 2014 by Cameron and Tyler Winklevoss.  Gemini is a cryptocurrency exchange and custodian, allowing customers to buy, sell, and store digital assets on its "omnibus wallet" or master holding account.

32.     Gemini's custody project holds customer's digital assets in secure offline systems, or "cold storage."  Because the assets are in a master holding account, assets can be moved throughout the Gemini platforms without having to process transactions on the blockchain and thus incur the associated fees, or "gas fees."

33.     In 2016, Gemini was approved as the first licensed Ethereum exchange based in the United States.  In 2018, Gemini began to utilize NASDAQ's SMARTS technology to monitor trades and combat fraudulent activity and price manipulation on its exchange.

34.     That same year, the New York Department of Financial Services approved the Gemini dollar (GUSD), and the digital currency launched shortly after.  Gemini described the Gemini dollar as a stablecoin, purportedly maintaining a 1-to-1 peg with the U.S. Dollar.

35.     In November of 2019, Gemini bought Nifty Gateway, adding to their immense crypto-finance portfolio.

### *"Nifties" are Securities*

36.     At the most basic level, a security is a financial asset or instrument that has value and can be bought, sold, or traded.  Some of the most common examples of securities include stocks, bonds, options, mutual funds, and ETFs.  Securities are interests representing rights in something else of value. Securities "differ significantly from other things that are traded in commerce to the extent that [they] are intangible and are neither produced nor consumed."[1]

37.     Securities are important because they are a part of fundamentally every aspect of American life. Put simply,

> Securities are the instruments which evidence the financial rights, and in some instances, the power to control, the corporations which own the great majority of our nation's and the world's productive facilities. Securities are the instruments through which business enterprises and governmental entities raise a substantial portion of funds that are used to finance new capital. Securities are the instruments in which many millions of Americans (and investors all over the world) invest their savings in order to provide for their retirement income, education for their children, or in the hopes of achieving a higher standard of living for themselves and their family.[2]

38.     The Security Act of 1933 (The "Securities Act") controls the registration and sale of securities. The Exchange Act of 1934 (the "Exchange Act") controls trading of those securities after issue. Both are governed by the Securities Exchange Commission ("SEC").

---

[1] Thomas Lee Hazen, Treatise on the Law of Securities Regulation, 1 Law Sec. Reg. § 1:48.
[2] *Id*.

39.     Under the Exchange Act, a "security" has an exceptionally broad definition, encompassing the instruments detailed above, and more.  Notably, under Section 2(a)(1) of the Exchange Act, an "investment contract" is considered a security, 15 U.S.C.A. § 77b(a)(1).

40.     The Supreme Court has adopted a test to determine if an instrument is an investment contract and likewise a security in *SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946).  Under *Howey*, investment contracts are defined as "a contract transaction or scheme whereby a person invests [their] money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by normal interests in the physical assets employed in the enterprise."[3]

41.     Nifties are securities because they constitute investment contracts under the definition set out in *Howey*.  Nifties are an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  Furthermore, the circumstances surrounding the creation of Nifty digital assets and the manner in which they are offered, sold, and/or resold to investors are what makes Nifties securities under the law.

30.     The SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets," (the "Framework") in April 2019, providing "a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of digital assets are securities transactions."  Nifties are securities under the SEC's Framework.

31.     The Framework explains the basics of the *Howey* test:

The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists where there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "Howey test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of

---

[3] *Id*. at 298-299.

the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary marker sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

32.    Investors who bought Nifties invested money or other valuable consideration in a common enterprise—Nifty Gateway and by extension, Gemini and its custodial platform. Investors invest because they have a reasonable expectation of profit, and such profit is derived from both Gemini and Nifty Gateway's managerial efforts to promote and market their platforms and thus maintain investor profits.

33.    Furthermore, Nifties are securities because they are crypto assets, alienable instantaneously, hyped up as investments, issued and maintained by Nifty Gateway and sold on the secondary marketplace that Nifty Gateway controls, promotes, supports and continues to make profits from.  Moreover, not only does Nifty Gateway retain an interest in the price of Nifties, but the overall price is dependent on Nifty Gateway's efforts and ability to succeed in stimulating demand, to convince creators to offer digital work on the Nifty Gateway Platform, to establish and produce network effects in the NGP, and to grow its platform.

### *Nifty Purchasers Invested Money in the Nifty Gateway Platform*

34.    Investors purchasing Nifties made an investment of money or other valuable consideration for the purposes of the *Howey* test.  As the SEC states in its Framework: "The first prong of the Howey test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

35.     Nifty Gateway knows that purchasers of Nifties view them as investments and factors this into their marketing efforts and schemes.  For example, Nifty Gateway often tweets information from its official Twitter account announcing future "exclusive drops" and detailing exclusive drop times for Nifty Gateway Collectors—with drops becoming available to the general public significantly later in the day.

36.     For example, on November 28, 2022, Nifty Gateway promoted on their Twitter account with drop details for a work entitled "Revenge of the Nation State" by the artist Slimesunday.  The Tweet explains that the work would be "dropping in 30 minutes on NG…available for 30 seconds."[4]  However, this drop could only be accessed by Nifty Gateway users who had already purchased at least three (3) Nifties.  Not surprisingly, once the drop began, the Nifty Gateway platform exploded—evidenced by a tweet from Nifty Gateway co-founder Griffin Cock Foster stating: "USERS ARE FLOODING ONTO THE SITE."[5]  After the drop, Nifty Gateway wasted no time promoting the works on their secondary marketplace with a tweet stating, "Available on secondary" and provided a direct link to the Nifty Gateway secondary market.[6]

37.     Through this drop promotion, Nifty investors were provided early access to the drop, and the general public was boxed out of purchasing on the primary market.  Thereafter, this Nifty was only available on the secondary market, as explicitly stated by Nifty Gateway itself.

38.     As a result, this drop demonstrates the blatant investment opportunity Nifty Gateway's efforts provided, and continues to provide, to consumers.  Nifty Gateway encourages

---

[4] Nifty Gateway (@niftygateway), Twitter (Nov. 18, 2022, 4:30 PM),
https://twitter.com/niftygateway/status/1593718226436882432
[5] Griffin Cock Foster (@gcockfoster), Twitter (Nov. 18, 2022, 4:51 PM),
https://twitter.com/gcockfoster/status/1593723595368591361
[6] Nifty Gateway (@niftygateway), Twitter (Nov. 18, 2022, 5:13 PM),
https://twitter.com/niftygateway/status/1593729020415320066

consumers to buy into their platform by providing and promoting investments that are exclusive to and for access users.  As a result, and through the direction, effort and promotion of Nifty Gateway, consumers buy Nifties to gain access to the Nifty Gateway Platform, so that they can turn around and sell such Nifties for a profit on the secondary platform.

39.     Another example of these efforts and scheme can be shown through the Nifty entitled "Broads in Atlanta" by WhIsBe and published by Nifty Gateway Curated.[7]  This Nifty is actually fifteen (15) identical editions picturing a rotating panda holding a sign in a similar manner to individuals going through intake at a police station.  Upon its release in March of 2021, the different editions of this Nifty were sold nine (9) times on the secondary market and produced over $285,000.00 on the secondary market.

40.     This Nifty proved to be extremely lucrative for initial investors that sold on the secondary market, with an initial buy-in price of $10,000; however, its value quickly plateaued leaving owners no option but to hold the Nifty until more desirable market conditions occurred. The current asking price for this Nifty on the secondary markets ranges from $30,000 to $49,999— this asking price has been set for over a year, with its highest active offer set at the low price of $1,000.

### *Nifty Investors Participated in a Common Enterprise*

41.     The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists."  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

42.     The Nifty Gateway Platform, Gemini's custodial platform, and the Publishers supported and endorsed thereby, individually and together constitute a common enterprise as

---

[7] WhIsBe, *Broads in Atlanta*, Nifty Gateway (2021),
https://www.niftygateway.com/marketplace/collection/0x9c55cc89feddc087474a d39e4e0259401b57bd455/5v

respect to which the fortunes of digital asset purchasers are linked to each other and to the success of the Defendant promoter's efforts, and which are subject to network effects caused and expanded by the efforts and promotion of Defendants.

43.     Investors who buy Nifties are passive participants in the enterprise, with the profits of each investor deeply intertwined with the fate of the Nifty Gateway Platform and Gemini's custodial platform.  Unlike Bitcoin, which is decentralized, here, Defendants Nifty Gateway and Gemini control the enterprise sharing in both profits and risks by marketing and maintaining the exchange in hopes of maximizing both investor and their own owner profits.  After investors purchase Nifties, the investor is entirely reliant on the Nifty Gateway Platform to make a profit through its marketing and promotion efforts to find a purchase in either the primary or secondary markets, but also to get one's funds and assets out.  Accordingly, investors in Nifties participate in a common enterprise in which their digital asset fortunes are linked to each other and to the success of the Defendant promoter's efforts.

44.     The test for establishing the existence of Common Enterprises has two facets. A plaintiff must either show horizontal commonality or strict vertical commonality—Both facets are present here. The SEC has already stated that: "In evaluating digital assets, we have found that a 'common enterprise' typically exists…because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."  Further, "strict vertical commonality exists when the fortunes of the investor are tied to the fortunes of the promoter. Where strict vertical commonality exists, 'the fortunes of plaintiff and defendants are linked so that they rise and fall together."[8]  Courts have also found that "where an investment manager earns a fee based on the ultimate performance of an investment, strict vertical commonality does exist."[9]

---

[8] *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 359-360 (S.D.N.Y. 2011).
[9] *Marini v. Adamo*, 812 F. Supp. 2d 243, 260 (E.D.N.Y. 2011).

45.     Here, Nifty Gateway shares in between 5 and 10% of the proceeds for the sale of Nifties on its primary and secondary markets which plainly constitutes strict vertical commonality as described above.  Not only does Nifty Gateway share in proceeds, but an investor's success is entirely dependent on Nifty Gateway's continued maintenance and promotion of the Nifty Gateway Platform.

46.     Alternatively, Plaintiff can establish a Common Enterprise through horizontal commonality. Specifically, "[i]n an enterprise marked by horizontal commonality, 'the fortunes of each investor in a pool of investors' are tied to one another and to the 'success of the overall venture.'"[10]  Nifty Gateway clearly represents in its Terms of Use and on its FAQ threads that Nifty Gateway maintains an omnibus wallet containing all client funds. This pooling of assets demonstrates the common enterprise in which all investors contribute. As a result, the proceeds of investor's purchases in Nifties are pooled together by Nifty Gateway, which in turn, works to stir up interest in the marketplace for Nifties, which have network effects further driving interest, traffic, and money to the Nifty Gateway Platform.  Without continued traffic in the primary and secondary marketplace, and interest and faith in the Nifty Gateway Platform, the investments necessarily fail.

47.     Courts have found that when a promoter sells crypto assets to investors and uses the proceeds to strengthen its ecosystem—which in turn supports the value of the crypto asset— horizontal commonality is met.[11]  Again, as detailed above this standard is likewise met here.

### *Like any Investment, Nifty Investors had a Reasonable Expectation of Profit*

48.     The SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or thorough other methods of realizing appreciation on the asset, such

---

[10] *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019).
[11] *Id.*

as selling at a gain in a secondary market." Further, while the *Howey Test* sets forth the objective framework, the subjective intent of purchasers is most probative on the issue of what a reasonable investor would expect.

49.    In particular, the SEC's Framework identifies a number of factors to help assess whether the "reasonable expectation of profits" element is met:

The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:

The digital asset gives the holder rights to share in the enterprise's income *or profits or to realize gain from capital appreciation of the digital asset.*

> *The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.*

> This also can be the case where the digital asset gives the holder rights to dividends or distributions.

*The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.*

*Purchasers reasonably would expect that an AP's [Active Participant, or promoter] efforts will result in the capital appreciation of the digital asset and therefore be able to earn a return on their purchase.*

The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

(Emphasis added)

50.    As shown above, Defendants are clearly promoting and encouraging consumers to purchase Nifties on their Platform and have done so in such a way to provide investors with a reasonable expectation of profit.

***Nifty Investors relied on the Managerial Efforts of Gemini and Nifty Gateway to Make and Maintain their Profits***

51.     The final *Howey* prong requires consideration of whether profits are derived from the efforts of others.  This element is met where the promoters' efforts are "undeniably significant ones[.]"[12]

52.     The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

53.     The Framework continues:

Although no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the "efforts of others":

***An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.***

> Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network."

***An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by***

---

[12] See *ATBCOIN*, 380 F. Supp. 3d at 354-355 (citations omitted).

*limiting supply or ensuring scarcity,* through, for example, buybacks, "burning," or other activities.

*An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset.* In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

*An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network…*

(Emphasis added.)

54.     Purchaser of Nifties are entirely reliant on the managerial efforts of the issuers for their potential profits.  The success of Nifty Gateway's ability to maintain the Nifty craze is essentially what controls the investment.  This is, again, unlike an investment in Bitcoin, for example, which is decentralized and run by no one other than the market.

55.     Investors' profits in Nifties are to be derived from the managerial efforts of others, specifically of Nifty Gateway and Gemini.  Most immediately, should Nifty Gateway and Gemini fail to maintain the crazed level of hype and interest in Nifties, investor profits will dry up.  In addition, should Nifty Gateway and Gemini fail to maintain the Nifty Gateway platform, excitement over Nifties will wane and investor profit will take a hit as well.  Moreover, Nifty Gateway and Gemini create and support both the market for and the initial price of the digital assets, controlling the creation and issuance of the digital assets and taking other actions as set forth herein to support a market price of the digital asset, such as by limiting supply, ensuring scarcity, and limiting who can purchase in the primary market for resale on the secondary market.

### Nifty Gateway Uses its Control over the Platform to Prevent Investors from Cashing Out

56.     After investors purchase Nifties, they are entirely reliant on the Nifty Gateway platform to make a profit—by both finding a purchaser for resale in its secondary Marketplace, and through withdrawing the investor's money from the platform itself.

57.     While Nifty Gateway has proven itself more than capable of taking investors' money, they have likewise significantly disappointed investors in their ability to get their money back.  For example, currently pending in the UK courts and formerly dismissed in New York JAMS arbitration proceedings, there is a case that details but alleges different claims.  There, a consumer bid on a Nifty Gateway online auction for a work entitled "Abundance" by the artist Beeple, with the expectation of acquiring the original artwork offered for sale—not any other edition thereof.  Unbeknownst to the claimant, who had participated in prior auctions on the platform, this particular auction was "ranked."  A ranked auction means that the highest bidder receives the Nifty in question, and the next highest 100 bidders were awarded numbered editions corresponding to the position of their respective highest bids.  The claimant did not place the winning bid but did rank within the top 100 highest bidders.  As a result, Nifty Gateway is attempting to enforce this abnormal auctioneering scheme and to make the claimant pay the amount of his highest bid, for a "lesser than" work.

58.     This scheme, in and of itself, displays the deceptive nature of Nifty Gateway's platform and how the business operates.  Defendants present a Nifty as an elevated work of digital art, while simultaneously encouraging and, in some cases as shown above, forcing collectors to purchase a lower value work at the same price.  Effectively baiting and switching consumers while Defendants reap profits from the transaction fees of the top 100 bids involved in the auction. Defendants receive transaction fees from 100+ of the highest bids, while consumers are swindled into purchasing lower value Nifties that they didn't even want in the first place.

59.     Investors are finding it increasingly difficult to remove their Nifties from the Nifty Gateway Platform.  Some investors have even had their accounts frozen by Defendants because of their attempts at withdrawals.

### *The Class Has Suffered Significant Damages from Defendants' Actions*

60.    In some cases, Plaintiff and the Class have invested enormously in the Nifty Gateway Platform in hopes of setting themselves up for retirement, providing for their children's education, or purchasing a home.  In the meantime, while Nifty Gateway has gladly welcomed these investments, the NGP and market for Nifties—as well as the crypto market as a whole—has experienced incredible downturn and frightening gyrations.  At its height in 2020 – 2021, Nifty Gateway was trading in volumes in the billions.  At this time, artists were able to make upwards of $3 million from a single drop on the Nifty Gateway Platform.

61.    Because of Nifty Gateway's business strategy—focusing on curating hyped up drops and celebrity cash grabs aimed at gaining new customers—the platform ultimately experienced a downturn.  As quickly as Nifty Gateway became a top marketplace, it lost its position to other marketplaces with more verbose NFT content.

62.    Ultimately, as a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in Nifties and were denied the information that would have been contained in the materials required from the registration of the Nifties—have lost substantial amounts of money and other valuable crypto assets and have suffered significant damages in an amount to be proven at trial.

63.    These damages also consist of investments lost due to Nifty Gateway's mismanagement and instability of the marketplace and the corresponding, dramatic, fall of Nifty prices and popularity.  Plaintiff invested substantial funds into the Nifty Gateway marketplace based on Nifty Gateway's representations that it was the leading platform for NFTs, and as a result,

when Nifty Gateway failed to maintain that reputation, Plaintiff lost millions of dollars in profits they would have otherwise realized.

## CLASS ALLEGATIONS

64.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Nifties during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of Gemini and Nifty Gateway, members of the Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and directors of Gemini and Nifty Gateway have or had a controlling interest.

65.     **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members in the proposed Class. Plaintiff believes that Class members can be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

66.     **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

67.     **Adequacy:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class that he seeks to represent; Plaintiff has retained counsel competent and highly experienced in securities and class action litigation; and Plaintiff

and Plaintiff's counsel intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      Whether Defendants violated the Securities Act;

b.      Whether Nifties constitute securities under federal law and specifically whether Nifties constitute "investment contracts" under federal law, including finding that purchasing and/or investing in Nifties entails:

i.   an investment of money;

ii.   in a common enterprise;

iii.   with the expectation of profit;

iv.   to be derived from the efforts of others;

c.      Whether the Nifties can potentially qualify for an exemption from registration under the Securities Act;

d.      To what extent the members of the class have sustained damages and the proper measure of damages;

e.      Whether investors are entitled to recession for failure to comply with The Securities Act of 1933.

69.     **Superiority**: A class action is superior to all other methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of Securities Act**
**Unregistered Offer and Sale of Securities**
**Section 5 and 12(a)(1) of the Securities Act of 1933**

70.     Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

71.     The Securities Act of 1933 has two basic objectives: To require that investors receive financial and other significant information concerning securities being offered for public sale; and to prohibit deceit, misrepresentations, and other fraud in the sale of securities.  As respects both the intended results are the same: to protect investors and to protect the integrity of the markets.

72.     A foundational principle of the federal securities laws is that securities offerings must either be registered or exempt from registration.  Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through the mail or interstate commerce unless a registration statement has been filed and is in effect. Section 5(c) prohibits the offer to sell securities through the mail or interstate commerce unless a registration statement has been filed. Offers and sales must either be registered or meet the requirements of an exemption from registration.  Section 12(a)(1) of the Securities Act provides for civil liability for "[a]ny person who . . . offers or sells a security in violation" of Section 5 of the Securities Act.  The remedy available under Section 12(a)(1) is rescission.

73.     Registration statements have two principal parts.[13]  Part One is the prospectus, that is, the legal offering or "selling" document that must be delivered to everyone who is offered or buys the securities.  In the prospectus, the company must clearly describe important information about its business operations, financial condition, results of operations, risk factors, and management.  The prospectus must also include audited financial statements.  Part Two contains additional information and exhibits that the company does not have to deliver to investors but must file with the Securities Exchange Commission (SEC).

74.     Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means of instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

75.     Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security[.]" *Id.* § 77e(c).74.   When issued, the Nifties were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

76.     Defendants promoted, solicited and/or sold Nifties to Plaintiff and Members of the Class. Defendants thus directly or indirectly made use of means or instruments of transportation

---

[13] https://www.sec.gov/education/smallbusiness/goingpublic/registrationstatement

nor communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

77. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings of Nifties by Defendants described herein, nor were there any filings that substantiated any potential exemption from registration

78. Defendants' failure to register the Nifty securities deprived Plaintiff and other class members investors of material financial and other significant information concerning the securities being offered for public sale; and failed to protect investors from potential deceit, misrepresentations, and other fraud in the sale of securities. Defendants' failure to register the Nifty securities caused Plaintiff and class members investors significant monetary harm.

79. Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77c of this title…shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* § 77*l*(a)(1).

80. Accordingly, Defendants have violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act. *Id.* § 77*l*(a)(1).

81. Plaintiffs and the Class seek rescissory damages and interest thereon with respect to Nifties purchased during the Class Period.

## SECOND CAUSE OF ACTION
### Violation of the Deceptive Practices Act
### N.Y. Gen. Bus. Law, Art. § 349

82. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

83. Defendants issued securities in the form of Nifties, and promoted, solicited, and/or sold them to Plaintiffs and Members of the Class.

84. Under the Deceptive Practices Act, materially deceptive acts, practices or omissions that are likely to affect a consumer's selection or actions regarding the product are considered unlawful.

85. Defendants materially misrepresented and omitted that Nifties are, in fact, a security to the general public, Plaintiff and the Class. In doing so, Defendants omitted disclosures otherwise required when providing securities for offer and sale. Such misrepresentations and omissions were and continue to be material in that a reasonable consumer would have considered the documents and information contained therein important in deciding whether to invest in Nifties.

86. Such deceptive practices were indeed material because Plaintiff and Members of the Class relied on them in making their decisions to invest in Nifties as a security. Furthermore, a substantial likelihood exists that under the circumstances here, the deceptive practices would have had actual significance in Plaintiff and Members of the Class decisions to invest in Nifties and likewise, Defendants' scheme.

87. Finally, Defendants conduct plainly constitutes deceptive practices contrary to the plain rules of common honesty. Defendants failed to represent Nifties according to state and federal law and have injured plaintiff and members of the class as a result.

88.     As a result, Defendants' deceptive practices are material, and reasonable investors would have considered them important in deciding whether to invest in Nifties.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT

89.     Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

90.     Plaintiff and Class Members conferred a benefit upon Defendants by depositing their currency funds and cryptocurrency assets into their accounts maintained by Defendants and maintained such assets in those accounts, which enabled Defendants to profit from the investment and trading of such assets.

91.     Plaintiff and Class Members conferred a benefit upon Defendants by paying fees to Defendants in order to conduct transactions in their accounts, maintain their accounts, and have access to those accounts.

92.     As a result of Defendants' actions and omissions alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and Class Members.  Under principles of equity and good conscience, Defendants should not be permitted to retain the transaction fees paid by Plaintiff and Class Members or the assets held within Plaintiffs' and Class Members' accounts.

93.     Plaintiff and Class Members are entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all fee revenue, income, profits, and other benefits obtained by Defendants at the expense of Plaintiff and Class Members resulting from Defendants' actions and/or omissions alleged herein, all in an amount to be proven at trial. Plaintiff and Class Members also are entitled to attorney's fees, costs and prejudgment interest, along with any relief that this Court deems just and proper.

94.    Plaintiff and the Class have no adequate remedy at law.

## **PRAYER FOR RELIEF**

95.    On behalf of themselves and the Class, Plaintiff request relief as follows:

a.    That the Court determine that this action may be maintained as a class action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action be given to Class members;

b.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal laws set forth above;

c.    That Pursuant to Section 8A of the Securities Act, Defendants cease and desist from committing or causing any violations or any future violations of Sections 5(a) and (c) of the Securities Act.;

d.    That Pursuant to Section 21C of the Exchange Act, Defendants cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), and 13b(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-15(a) thereunder;

e.    That the Court order Defendants to register and/or file for and justify an exemption from registration of the Nifty Securities under the Securities Act by a date certain;

f.    That the Court order Defendants shall pay disgorgement in an amount to be determined at trial and prejudgment interest thereon:

g.    That the Court order Defendants to institute and offer a period of rescission to enable Class Members to rescind the purchase of their unregistered Nifty Securities;

h.    That the Court award Plaintiff and the Class other damages in an amount to be determined at trial and prejudgment interest thereon;

i.    That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiff and the Class are entitled;

j.    That the Court award Plaintiff and the Class pre- and post-judgement interest;

k.    That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit; and

l.    That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

96.     Plaintiff respectfully demands a trial by jury for all claims.


Respectfully Submitted this 13th day of December 2022.




Herman Jones, LLP

/s/ *Serina M. Vash*

Serina M. Vash
(NY Bar No. 2773448)
153 Central Avenue, # 131
Westfield, New Jersey 07090
svash@hermanjones.com
404-504-6516

Of Counsel:
John C. Herman
Herman Jones, LLP
3424 Peachtree Road, Suite 1650
Atlanta, Georgia 30326
jherman@hermanjones.com
404-504-6500