## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN HASTINGS, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>NIFTY GATEWAY, LLC and THE GEMINI TRUST COMPANY, LLC,<br><br>        Defendants. | Civil File Action No. 1:22-cv-10517-AT |

## MEMORANDUM OF LAW OPPOSING DEFENDANTS' MOTION TO COMPEL

## ARBITRATION AND STAY PROCEEDINGS

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................7

II.   FACTUAL BACKGROUND ................................................................................8

   A. Defendants and the Nifty Securities at Issue. ........................................................8

   B. Nifties are Securities ...........................................................................................10

   C. Plaintiff Hasting's Account Creation and Nifty Purchases..................................11

III.    ARGUMENT ...................................................................................................12

   A. Gateway Issues are for the Court unless Clearly Delegated by an Enforceable Delegation Clause...........................................................................................................12

   B. Evidentiary Challenges to the Declaration of Alex Nadler .................................14

   C. State Law Determines Contract Formation..........................................................19

   D. The Delegation Clause is Not "Clear and Unmistakable" ..................................21

   E. The April 2021 Terms and Arbitration Agreement embedded therein are Void and Unenforceable ......................................................................................................22

     1. Mutual Assent .................................................................................................23

     2. Illusoriness .......................................................................................................25

     3. Unconscionability ...........................................................................................28

   F.  Securities Class Actions Should Be Resolved By the Federal Court ..................31

IV.   CONCLUSION ................................................................................................34

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Pages**

*Advantage Physical Therapy, Inc. v. Cruse*,
    165 S.W.3d 21 (Tex. App. 2005) ....................................................................24

*Arthur Andersen L.L.P. v. Carlisle*,
    556 U.S. 624 (2009) ....................................................................................20

*Bank v. WorldCom, Inc.*,
    2002 WL 171629 (N.Y. Sup. Ct. Jan. 24, 2002) ..........................................30

*Berkson v. Gogo LLC*,
    97 F.Supp.3d 359 (E.D.N.Y. 2015) ..............................................................25

*Broadnax v. Ledbetter*,
    100 Tex. 375 (1907) ....................................................................................24

*Buckeye Check Cashing Inc. v. Cardegna*,
    546 U.S. 440 (2006) ....................................................................................14

*David v. #1 Mktg. Serv., Inc.*,
    979 N.Y.S.2d 375 (N.Y. App. Div. 2d Dep't 2014) ......................................29

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) ....................................................................................13

*DeClaire v. G & B Mcintosh Family Ltd. P'ship*,
    260 S.W.3d 34 (Tex. App. 2008). .................................................................24

*Doctor's Associates, Inc. v. Casarotto*,
    517 U.S. 681 (1996) ....................................................................................20

*Dreyfuss v. eTelecare Global Solutions-U.S. Inc.*,
    349 F. App'x 551 (2d Cir. 2009)..............................................................15, 16

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995) ....................................................................................20

*Forest Park Pictures v. Universal Television Network, Inc.*,
    683 F.3d 424 (2nd Cir. 2012) ......................................................................20

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) .................................................................................13, 32

*Granite Rock Co. v. Int'l Bhd. Of Teamsters*,
    561 U.S. 287 (2010) .................................................................................13, 14, 15

*GTFM v. TKN Sales, Inc*.,
    2000 WL 364871 (S.D.N.Y. Apr. 7, 2000) ..............................................13

*Haft v. Haier US Appliance Solutions, Inc*.,
    578 F. Supp. 3d 436 (S.D.N.Y. 2022) .....................................................29

*Henry Shein, Inc. v. Archer and White Sales, Inc.*,
    139 S. Ct. 524 (2019) ..............................................................................15

*Hines v. Overstock.com, Inc.*,
    380 F. App'x 22 (2d Cir. 2010) ..........................................................15, 24

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002) ..................................................................................13

*In Matter of Exp. Indus. and Terminal Corp*.,
    93 N.Y.2d 584 (1999)..............................................................................24

*In re 24R, Inc*.,
    324 S.W.3d 564 (Tex. 2010) ..................................................................26

*In re FirstMerit Bank,*
    52 S.W. 3d 749 (Tex. 2001) ...................................................................29

*Kai Peng v. Uber Techs. Inc*.,
    237 F. Supp. 3d 36 (E.D.N.Y. 2017) ......................................................29

*Kulig v. Midland Funding, L.L.C*.,
    2013 WL 6017444 (S.D.N.Y. Nov. 13, 2013) ........................................15

*Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co*.,
    28 N.Y.3d 675 (2017).............................................................................26

*Lipsett v. Banco Popular N. Am*.,
    2022 WL 17547444 (S.D.N.Y. Dec. 9, 2022) ........................................29

*Manigault v. Macy's East, LLC*,
    318 Fed. App'x 6 (2d Cir. 2009)............................................................15

*Matter of Allstate Ins. Co. (Stolarz)*,
    81 N.Y.S. 2d 219 (1993) ........................................................................20

4

*Matter of State of New York v. Avco Fin. Serv. N.Y., Inc.*,
　　429 N.Y.S.2d 181 (N.Y. 1980).................................................30

*Mayfield v. Asta Funding, Inc.*,
　　95 F. Supp. 3d 685 (S.D.N.Y. 2015) ..........................................15

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
　　473 U.S. 614, 628 (1985) .......................................................32

*Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union*,
　　975 F.Supp. 445 (E.D.N.Y. 1997) ..............................................13

*Nelson v. Watch House Int'l, LLC*,
　　815 F.3d 190 (5th Cir. 2016) ...................................................26

*Opals on Ice Lingerie v. Bodylines Inc.*,
　　320 F.3d 362 (2d Cir. 2003) ...............................................15, 16

*Open Text S.A. v. Box, Inc.*,
　　No 13-cv-04910-JD, 2015 WL 428365 (N.D. Cal. Jan. 30, 2015) ..................18

*Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
　　756 F.2d 230 (2nd Cir. 1985) ..................................................32

*Perry v. Thomas*,
　　482 U.S. 483 (1987) .............................................................20

*Prima Paint, Corp. v. Flood & Conklin Manufacturing Co.*,
　　388 U.S. 395 (1967) .............................................................14

*Register.com, Inc. v. Verio, Inc.*,
　　356 F.3d 393 (2nd Cir. 2004) ..................................................24

*Rent-A-Ctr., W., Inc. v. Jackson*,
　　561 U.S. 63 (2010) ........................................................13, 14, 22

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
　　490 U.S. 477 (1989) .............................................................32

*SEC v. W.J. Howey Co.*,
　　328 U.S. 293 (1946) .............................................................10

*Shearson/Am. Exp., Inc. v. McMahon*,
　　482 U.S. 220 (1987) .............................................................32

*Shema Kolainu-Hear Our Voices v. ProviderSoft*, LLC,
    832 F. Supp. 2d 194 (E.D.N.Y. 2010) ...............................................................29

*Simar Holding Corp. v. GSC*,
    928 N.Y.S.2d 592 (N.Y. App. Div. 2d Dep't 2011) ...........................................29

*Ski River Dev., Inc. v. McCalla*,
    167 S.W.3d 121 (Tex. App. 2005) .....................................................................29

*Spears, Leeds & Kellogg v. Cent.  Life Assurance Co.*,
    879 F.Supp. 403 (S.D.N.Y. 1995) .....................................................................13

*Starke v. Gilt Groupe, Inc.*,
    2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ...................................................24

*State v. Wolowitz*,
    468 N.Y.S.2d 131 (N.Y. App. Div. 2d Dep't 1983) ..........................................29

*Tri-Continental Leasing Corp. v. Law Office of Richard W. Burns*,
    710 S.W.2d 604 (Tex. App. 1986) .....................................................................29

*Wade v. Austin*,
    524 S.W.2d 79 (Tex .Civ. App. 1975).................................................................29

*Whitt v. Prosper Funding LLC*,
    2015 WL 4254062 (S.D.N.Y. July 14, 2015)....................................................24

*Wilko v. Swan*,
    346 U.S. 427 (1953) ...........................................................................................32

*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*,
    84 N.Y.2d 309 (1994)..........................................................................................20

## **Statutes**

15 U.S.C. § 77z-1, *et seq.* ..................................................................................2

9 U.S.C. § 1, *et seq.* ...........................................................................................9

9 U.S.C. §2 .........................................................................................................14

Fed. R. Evid. 803(6) ....................................................................................12, 13

Fed. R. Evid. 902(11) .........................................................................................13

Plaintiff John Hastings ("Plaintiff") respectfully requests an order denying Defendants' Motion to Compel Arbitration, finding that such arbitration agreement and the delegation clause contained therein are inapplicable, void and unenforceable, and that this action should be maintained in federal court.

## I.    <u>INTRODUCTION</u>

This action arises from Nifty Gateway, LLC and the Gemini Trust Company, LLC's (together "Defendants"), maintenance and operation of the Nifty Gateway platform that promotes, offers, and sells unregistered securities throughout the United States in violation of federal securities laws. On December 13, 2022, Plaintiff John Hastings, ("Plaintiff") filed suit against Defendants on behalf of himself and a putative class of individuals likewise injured by Defendants' sale of unregistered securities.

Defendants sell securities known as "Nifties." This term is derived from the acronym NFT or Non-Fungible Token. NFTs are digital assets that can be bought, sold, and exchanged on proprietary trading platforms. Defendants Nifties are based off ofon digital artwork and collections. Despite their attempts to argue otherwise, Defendants' Nifties are securities in that their value solely derives from Defendant's promotion and maintenance of the Nifty Gateway Platform and the Nifties bought and sold thereon.

Plaintiff signed up for Nifty Gateway in May of 2020. Almost one year later, between February 23, 2021, and April 2, 2021, Mr. Hastings bought nine (9) Nifties on the Nifty Gateway Platform and received one (1) duplicate through an unauthorized purchase. Comp. ¶¶ 6-7. Plaintiff's claims are not subject to arbitration for several reasons. As an initial matter, Defendants fail to make the threshold showing that an agreement to arbitrate between the parties exists. As a

result, Defendants fail to meet their required burden for a Motion to Compel Arbitration and there remains a question of fact as to both the foundation of Defendants' arbitration claims and the scope of any claims brought thereunder. Second, Defendants likewise fail to make an initial showing that Plaintiff received adequate inquiry notice of the purported arbitration agreement and terms therein. Moreover, even if the Exhibits offered by Defendants in the Declaration of Alex Nadler, Dkt. 21, ("Nadler Decl."), were accurate and applied to Plaintiff—which Defendants have failed to establish—they are, nonetheless, unenforceable and void under state law contract principles concerning contract formation and unconscionability. Finally, arbitrating class action securities claims goes against public policy, hinders the effective resolution of class securities claims under both the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 77z-1, *et seq*., (the "PSLRA"), and contravenes Congressional intent behind such legislation. For all of these reasons, Plaintiff's claims are not, and should not, be subjected to arbitration and must remain in federal court.

## II.   FACTUAL BACKGROUND

### A.   Defendants and the Nifty Securities at Issue.

Nifty Gateway launched in 2018 and was acquired by Defendant Gemini shortly after in late 2019. In 2020, Nifty Gateway rose to popularity as one of the top marketplace exchanges to buy, sell, trade, and own NFTs. Their slogan is: "We will not rest until 1 billion people are collecting nifties."

As this court is aware, certain types of digital assets derive their value from the success or failure of a given project, promoter, or startup. Investors purchase this type of asset with the hope that its value will increase in the future as the project grows in popularity, based upon the managerial efforts of the issuer and those working to develop the project. Because this type of

digital asset is properly classified as an investment contract security under federal law, the issuers of this type of crypto assets, including Defendants, are required to file registration statements with the U.S. Securities and Exchange Commission ("SEC"), and comply with federal securities laws. These requirements are in place to protect the integrity of the markets and the assets of investors.

Defendants knew of these requirements, but nonetheless failed to comply. By selling these unregistered securities to investors, Defendants reaped millions of dollars in profits while Plaintiff's and class members' investments plummeted in value. In addition to providing the platform for the sale of these securities, Defendants also provide curated sales under their own "Nifty Gateway Curated" storefront. The Defendants specifically curates these drops—and only "top-tier" qualified NFT Artists vetted by Defendants and through Defendants' application and interview process may publish their Nifties on the Platform. NFTs drop from the Nifty Gateway Curated page every couple of days, with volumes ranging from as small as $299 to as large as $107,000 in the span of one week. After being sold on the primary market, Nifties can trade easily on the secondary market which is also created, maintained, and controlled by Defendants. Thus, there is a very real prospect of acquiring Nifties in limited drops and then re-selling for a huge profit in the secondary market, or even buying in the secondary and reselling in the same market at a higher price.

Throughout this entire process, Defendant Nifty Gateway retains an interest in the sale. Defendant Nifty Gateway receives 10% of the proceeds from each sale on the primary market and up to 5% of the proceeds from sales on the secondary market. Additionally, Nifty Gateway retains the rights, and is required to promote published Nifties on the Nifty Gateway Platform.

## B.     Nifties are Securities

Nifties are an investment contract under the *Howey* Test.[1] Nifties are non-fungible tokens created and promoted by Nifty Gateway and entitles holder to benefits on the Nifty Gateway exchange.   These benefits can range from exclusive drops to special additional merchandise alongside exclusive Nifties—available only to those who have previously purchased from the Nifty Gateway platform.   Nifties can be extremely profitable for the issuers because Nifty Gateway, as the facilitator, can and does keep a significant number of Nifties for themselves. Nifty Gateway can then promote these through social media and other announcements to reap disparate profits on the Nifty Gateway secondary market.   As Nifty Gateway promotes their platform, the Nifties thereupon grow in prominence and trading volume increases on the exchange. Thus, the value of Nifties increases as the Nifty Gateway platform grows and becomes more well-known and utilized.

Nifties pass the *Howey* Test because the entire Nifty process and exchange is controlled by Defendants; Defendants can create or destroy Nifties at will; and the value of Nifties are entirely based upon the success of the Nifty Gateway Platform as a whole.   This success is contingent on Defendants efforts to facilitate and promote the exchange, in addition to the Nifties sold thereupon. Moreover, it is quite clear that investors bought Nifties because they thought it would increase and price.   Indeed, this is the same reason why most, if not all, investors buy any given crypto assets. Thus, because Nifties are an investment in value of a common enterprise, and such value is

---

[1] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (explaining that an investment contract is a form of security when (1) the purchaser makes an investment of money or exchanges another item of value; (2) in a common enterprise; and (3) with the reasonable expectation of profits to be derived from the efforts of others.)

contingent on the efforts and promotion of others, Nifties squarely fall within the *Howey* Test's definition of an investment contract.

### C.     Plaintiff Hasting's 2020 Account Creation and 2021 Nifty Purchases

Plaintiff purchased his nine (9) Nifties on the Nifty Gateway platform on their respective 'minting' release dates and received a duplicate Nifty through an unauthorized purchase. Moreover, Plaintiff purchased all of his Nifties from the Nifty Gateway Curated storefront, owned, managed and operated by Nifty Gateway.

Plaintiff is over the age of eighteen (18), has personal knowledge of his account creation, and could testify competently to the facts stated both here and, in his Declaration.  Declaration of John Hastings, ("Hastings Decl."), at 1, ¶ 1.  Plaintiff created his Nifty Gateway account on May 14, 2020,   using his snowfreeze@gmail.com email address after receiving an email from Defendants promoting the drop of the notorious "Crypto Kitties" NFT.  Hastings Decl., at 1, ¶ 3. Notably, aside from himself, Plaintiff has two other individuals within his household with "J. Hastings" names. Hastings Decl., at 1, ¶ 2.

After creating his account, Plaintiff received a "Welcome" email, notably devoid of any reference to applicable terms of use.  A true and correct copy of this email is attached to the Hastings Decl. as Exhibit A. Notably, when Plaintiff created his account and received this "Welcome" email, he did not receive notice of any applicable terms of use or agreement to arbitrate.  Hastings Decl., at 1, ¶¶ 4 & 5.  Nor did he negotiate or accept any such terms or agreements and would have opted out if given the opportunity to do so, as he has done on previous occasions with other like-situated companies.  Hastings Decl., at 2, ¶¶ 5 & 8.  Plaintiff maintains the documents proffered by Defendants in the Declaration of Alex Nadler, ("Nadler Decl."), Dkt.

21, Exhibits A and B, dated March 2021 and April 2021 respectively, are inapplicable to him as they were not present or shown when he created his account. Hastings Decl., at 2, ¶¶ 6 & 7.

## III.    ARGUMENT

Plaintiff cannot be forced to arbitrate federal securities claims based upon an unenforceable Arbitration Agreement buried in an unenforceable Terms of Use that was neither accepted by Plaintiff nor known to him. Moreover, federal jurisdiction and review of this Court is appropriate as Plaintiff seeks to challenge not only the Terms of Use in Nadler Decl., Exhibit B, (the "April 2021 Terms"), but also the Arbitration Agreement and Delegation Clause contained therein, (collectively the "Agreements"). As a threshold matter, Defendants have failed to produce operative Agreements binding Plaintiff to arbitration. Because the Arbitration Agreement lacks mutual assent no agreement was reached. Moreover, the purported agreement as put forth, is unconscionable and illusory in nature, and thus it is void and unenforceable. Not only are the Agreements unenforceable for these legal and evidentiary deficiencies, but likewise for the strong and prevailing policy arguments in favor of a public record and the judicial resolution of private securities class actions arising under the PSLRA. In sum, the Agreements challenged here do not bind Plaintiff to proceedings before an arbitral forum and are unenforceable under state law contract principles.

### A.    Gateway Issues are for the Court unless Clearly Delegated by an Enforceable Delegation Clause

In contrast to Defendant's assertions, the legislative history of the Federal Arbitration Act clearly establishes that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate on the same level as other contracts. Moreover, the Supreme Court expressly "reject[ed] the suggestion that the overriding goal of the [Act] was to

promote the expeditious resolution of claims" in 1985 with *Dean Witter Reynolds, Inc. v. Byrd*.[2]

Under this guidance, it is clear that agreements to arbitrate should not be given preferential

treatment and should be placed "on the same footing as other contracts."[3]  Indeed, district courts

in the Second Circuit have emphasized that "part[ies] will suffer irreparable harm if compelled to

arbitrate in the absence of any agreement to do so."[4]

Although Supreme Court precedent establishes a national policy designed to promote

arbitration, such policy is not intended to usurp traditional contract formation law. Gateway

disputes about whether parties are bound by an arbitration agreement are generally for the court to

decide.[5]  Ordinarily, issues about whether parties have agreed to a valid arbitration clause are

classic gateway issues for a court, and not an arbitrator to decide.[6] Moreover, the Supreme Court

has made clear that "[a]rbitration is strictly a matter of consent," and the "presumption of

arbitrability" does not apply unless and until a court finds that the parties have agreed to arbitrate

their disputes."[7]

An arbitrator, and not the court, may only decide gateway issues if two conditions are met:

(1) the agreement must clearly and unmistakably delegate the gateway issue to an arbitrator; and

(2) the delegation clause itself must not be subject to challenge under a law that would revoke any

---

[2] *Dean Witter*, 537 U.S. 213 at 219.

[3] *Gilmer v. Interstate/Johnson Lane Corp*., 500 U.S. 20, 24 (1991); *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219-220, and n.6 (1985).

[4] *GTFM v. TKN Sales, Inc*., 2000 WL 364871, at * 2 (S.D.N.Y. Apr. 7, 2000), *rev'd on other grounds,* 257 F.3d 235 (2nd Cir. 2001); *Mount Ararat Cemetery v. Cemetery Workers & Greens Attendants Union*, 975 F.Supp. 445, 447 (E.D.N.Y. 1997); *Spears, Leeds & Kellogg v. Cent.  Life Assurance Co*., 879 F.Supp. 403, 404 (S.D.N.Y. 1995), *rev'd on other grounds*, 85 F.3d 21 (2nd Cir. 1996).

[5] *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

[6] *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 77-78 (2010); *see also Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 399 (2010).

[7] *Granite Rock*, at 299-300 and n.1.

contract, such as formation. These two conditions must be met for an arbitrator to decide gateway issues.

In *Prima Paint, Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 403 (1967), and *Buckeye Check Cashing Inc. v. Cardegna*, 546 U.S. 440, n.1 (2006), the Supreme Court ruled that when a party challenges the validity of an entire contract on any ground *other than whether the parties assented thereto*, the agreement to arbitrate is separable from the agreement as a whole such that an arbitrator must decide challenges to the rest of the contract. The Court further explained in *Granite Rock* that under *Buckeye* and *Rent-A-Center*, arbitration clauses are separately enforceable "unless the party resisting arbitration…claims that the agreement to arbitrate was never concluded."[8]

Therefore, where, as here, the party resisting arbitration argues the very existence of an agreement to arbitrate, the agreement to arbitrate will not be treated as separately enforceable from the overarching terms of use it is embedded in under *Prima Paint*, *Buckeye*, *Rent-A-Center*, and *Granite Rock*. In sum, the question of contract formation is clearly a decision for the court if challenged by the party opposing arbitration. Unless an ***enforceable*** clause clearly and unmistakably delegates the issue to an arbitrator—which cannot be so when the clause is embedded in an unenforceable agreement, the court must decide the gateway questions of formation.

**B.     Evidentiary Challenges to the Declaration of Alex Nadler**

Defendants have failed to make the required prima facie showing of an agreement binding the parties to arbitration and the terms and provisions found therein. Defendants do not provide a

---

[8] *Granite Rock*, at 301.

binding and enforceable agreement to arbitrate, and as a result, cannot argue the application of any purported delegation clause contained therein. The Federal Arbitration Act, (the "FAA"), 9 U.S.C. § 1, *et seq.*, provides that a court may compel arbitration only "upon being satisfied that the making of the agreement or the failure to comply therewith is not at issue."[9] This notion was affirmed by the Supreme Court in *Granite Rock*, where the Court explained that courts must decide motions to compel arbitration by "applying the presumption of arbitrability ***only*** where a validly formed and enforceable agreement is ambiguous about whether it covers the dispute at hand."[10] The Court further affirmed this premise in *Henry Shein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 530 (2019), stating, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." Therefore, the initial burden is on the party seeking to compel arbitration to prove that a valid agreement to arbitrate exists. Failure to produce an agreement has been ruled as grounds for denial of the motion.[11] It is "well settled under New York law that arbitration will not be compelled absent the parties' ***clear, explicit and unequivocal*** agreement to arbitrate."[12]

This Court has previously denied an attempt to bind a Plaintiff to an arbitration agreement where it is solely based on sample contracts from the relevant time period. In *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685 (S.D.N.Y. 2015) (Preska L.), this Court denied defendants'

---

[9] 9 U.S.C. § 4.

[10] *Granite Rock*, at 300 (emphasis added).

[11] *See e.g., Kulig v. Midland Funding, L.L.C.*, 2013 WL 6017444 * 8 (S.D.N.Y. Nov. 13, 2013) (holding sample cardmember agreement as insufficient evidence of an arbitration clause); *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010); *Dreyfuss v. eTelecare Global Solutions-U.S. Inc.*, 349 F. App'x 551, 555 (2d Cir. 2009); *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003) (requiring "that parties actually agree to arbitration before [the Second Circuit] will order them to arbitrate a dispute.").

[12] *Manigault v. Macy's East, LLC*, 318 Fed. App'x 6, 7-8 (2d Cir. 2009) (summary order) (internal quotations omitted) (emphasis added).

motion to compel arbitration where they could not produce the agreements actually signed by plaintiffs and instead relied on "sample contracts" from the relevant time period, supplemented by a declaration from a corporate witness asserting that the missing contracts also mandated arbitration. *Id*. at 693-94. The court found that this was not sufficient evidence to show a binding agreement between the parties.

Likewise, in *Opals on Ice Lingerie v. Bodylines Inc*., 320 F.3d 362, 369 (2d Cir. 2003), the Second Circuit affirmed the district court's denial of a motion to compel arbitration where both parties signed documents agreeing to arbitration but never signed the same document containing a complete list of agreed upon arbitration procedures. Similarly, in *Dreyfuss v. eTelecare Global Solutions-U.S. Inc*., 349 F. App'x 551, 552-53 (2d Cir. 2009), the party seeking arbitration produced a copy of the first and last page of a signed arbitration agreement but was unable to produce the pages in between. There, the Second Circuit held that, "even if a contract did exist in this case, the agreement is not enforceable because . . . the party seeking enforcement . . . has failed to prove its terms." *Id*. at 555. Defendants attempt to bind Plaintiff to a sample agreement alleged to be substantially similar to the contract in effect when Plaintiff created his account. Here, not only do Defendants fail to prove an agreement exists, but as a result, have also failed to prove the existence or terms of any agreement to arbitrate.

Defendants provide only two documents in support of their contention that an agreement to arbitrate between the parties here exists. Through a declaration, Defendants have produced these documents, effective March 2021 and April 30, 2021, and attempt to claim that they applied to Plaintiff when he created his account, almost one year prior on May 14, 2020. Hastings Decl., at 1 ¶ 3. Not only was this agreement explicitly not in effect at the time of Plaintiff's account creation, but Defendants have likewise failed to properly authenticate either document provided.

First, Defendants attach as <u>Exhibit A</u> to the Nadler Decl., a copy of the Nifty Gateway sign-up page that was in effect on or about March 10, 2021 (the "March 2021 Sign-Up Page"). The March 2021 Sign-Up Page demonstrates nothing more than what individuals creating accounts on or after March 10, 2021, may have seen at the time. Plaintiff maintains this was not the page he saw and used when creating his account on May 14, 2020. Hastings Decl., at 2 ¶ 7. Moreover, the sign-***in*** page, which users see each time they access their accounts, is different from the March 2021 Sign-Up Page. When a user signs in to their previously-created account, they receive no notice or hyperlinks to any agreements. Plaintiff maintains he created his account on May 14, 2020, and a true and complete copy of the confirmation email here received is attached as Exhibit A to his Declaration. Thus, Defendants have failed to make a *prima facie* initial showing that an agreement to arbitrate exists between the parties.

Second, Defendants provide, as <u>Exhibit B</u> to the Nadler Decl., a copy of the Nifty Gateway Terms of Use in effect on or about April 30, 2021. For the same reasons explained above, this is not sufficient for a prima facie argument that the purported agreement in issue, one from a full calendar year earlier, actually exists and binds Plaintiff to arbitration. Moreover, Plaintiff purchased the Nifties at issue prior to April 30, 2021, so Defendants do not—and cannot—even argue that this agreement was in effect at the time of purchase. As noted above, the sign-in page, an entirely *different* page that the user sees each time they access their account after creation, does not reference the existence of any terms nor does it provide an opportunity to opt out of arbitration.

Moreover, when using the same internet archive as Defendants, Plaintiff was able to find multiple versions of Defendant's terms—notably none were operative when Plaintiff created his

account.[13]  But most notably, each different Terms of Use had changes, not only to the arbitration agreement, but also to the individual Terms provisions.  As a result, Defendants cannot demonstrate  that the agreement, which is inapplicable to Plaintiff for the various aforementioned reasons, is "substantially similar" to an agreement in effect formed one year earlier.  Nadler Decl., at 3 ¶ 9.

Finally, Plaintiff also takes issue with the Nadler Decl. as a whole.  This Declaration was made by the Manager of Trust & Safety at Nifty Gateway, LLC—a vague position that Defendants fail to explain what connection or affiliation it has—if any—with the documents here.  While this may not preclude a thorough review of a company's documents and records by the proper party, no such review is attested to.  Moreover, despite the statement that the Nadler Decl. is based on his "personal knowledge and review of Nifty Gateway's records," Defendants fail to provide any basis on which a foundation of personal knowledge might be supported, or that these documents might be authenticated.

Under the federal rules of evidence the proponent of a business record must establish, as a prerequisite to its admissibility, (1) that the record was created at or near the time of the events they purported to establish by someone with knowledge of those events; (2) that the record was kept in the course of regularly conducted business; and (3) that the record was made as part of that business's regular practice.[14]  Under Federal Rules of Evidence 803(6), certain business records, satisfying the requirements of the Rule, may also be self-authenticated if certified by "the custodian

---

[13] It is worth noting, that courts are divided on the authenticity and reliability of internet archive resources like the Wayback Machine.  *See, e.g., Open Text S.A. v. Box, Inc.*, No 13-cv-04910-JD, 2015 WL 428365, at *2 (N.D. Cal. Jan. 30, 2015) (finding proffered Wayback Machine printouts not authenticated absent certification from representative of InternetArchive.org).
[14] Fed. R. Evid. 803(6).

or another qualified person."[15] Websites, in particular, present unique issues regarding authentication due to their dynamic nature. While the authenticity of *existing* website information can be determined by conducting a basic Internet search, proving *historic* information raises issues concerning whether the information was actually posted as the proponent says it was.

The records offered by Defendants in Nadler Decl. Exhibits A and B cannot be self-authenticated because they do not meet the requirements of Fed. R. Evid. 803(6), and thus cannot meet the requirements of Fed. R. Evid. 902(11). Specifically, the records, as conceded by Defendants, were not made at or near the time of events they purport to establish, namely May 14, 2020, the date of Plaintiff's account creation. Indeed, Defendants' Exhibits have the operative dates of March 2021 and April 30, 2021—dates far too attenuated to be claimed to apply to an account created a year prior. By failing to satisfy the requirements of Rule 802(6), the documents likewise cannot be self-authenticating under Rule 902(11). Therefore, because the documents proffered by Defendants have not been properly authenticated, they are inadmissible and should not be considered.

Defendants fail to make a prima facie case establishing an agreement binding the parties to arbitration, which ultimately ends the inquiry. However, *assuming arguendo* and agreement exists, the agreements would nonetheless be void and unenforceable as against Plaintiff and the class under state law contract principles, regardless of what state's laws might apply.

## C.      State Law Determines Contract Formation

Questions of contract formation are governed by traditional state law principles. The FAA's savings clause, which explicitly saves from preemption state law "grounds as exist at law

---

[15] Fed. R. Evid. 902(11).

or in equity for the revocation of any contract."[16] The Supreme Court has explained that Section 2 concerns the *enforcement* of arbitration clauses and states that: "state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."[17]

In order to enforce an arbitration agreement, the moving party must prove an agreement to arbitrate exists and that both parties consented to the terms. Whether an agreement has been validly formed is determined under principles of state contract law. Further, choice of law is determined by the forum state's rules, making New York's choice of law doctrine applicable here.[18] New York takes the "center of gravity" approach which requires applying the law of the state with "the most significant relationship to the transaction and the parties."[19] Further, while no one factor is dispositive, New York gives "[t]he place of contracting and place of performance…the greatest weight."[20]

---

[16] 9 U.S.C. §2.

[17] *Perry v. Thomas*, 482 U.S. 483, n.9 (1987). The Court has consistently reiterated this notion in subsequent Arbitration case law. *See e.g.*, *Arthur Andersen L.L.P. v. Carlisle*, 556 U.S. 624, 630 (2009) ("Neither [9 U.S.C. § 2 nor § 3] purports to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them). Indeed, § 2 explicitly retains an external body of law governing revocations (such grounds 'as exist at law or in equity.').");  *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686-687 (1996) ("Repeating our observation in *Perry*, the text of § 2 declares that state law may be applied '*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.'"); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter…, courts generally…should apply ordinary state-law principles that govern the formation of contracts.").

[18] For the same reasons the Delegation Clause is inapplicable here, the Choice of Law provision is likewise inapplicable.

[19] *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc*., 84 N.Y.2d 309, 317 (1994) (quoting Restatement (Second) of Conflict of laws § 1881).

[20] *Forest Park Pictures v. Universal Television Network, Inc*., 683 F.3d 424, 433 (2nd Cir. 2012) ("The place of contracting and place of performance are given the greatest weight." (citing *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.S. 2d 219, 226 (1993))).

Here, there are two options for controlling law, New York and Texas. Plaintiff believes that Texas contract law applies because it has been the forum for each step of his relationship with Defendant Nifty Gateway. Not only is Texas his place of domicile, but each of his interactions with Nifty Gateway, including all nine (9) of his purchases, occurred in Texas. As a result, Nifty Gateway has transacted business in Texas. Because the alleged agreements here, if applicable to Plaintiff, would have been executed and fully performed in Texas, contract formation should be determined by the laws of the state of Texas.[21]

**D.    The Delegation Clause is Not "Clear and Unmistakable"**

In addition to Defendants' failure to meet their *prima facie* burden, the agreements in Nadler Decl., Exhibit B are void for lack of mutual assent and illusoriness and are unenforceable as unconscionable under both New York and Texas law.

First, as explained above, whether a binding contract to arbitrate has been formed is for the Court to determine absent a "clear and unmistakable" delegation clause providing otherwise. The Delegation Clause (the "Clause") contained in the documents provided by Defendants is not "clear and unmistakable" and thus does not delegate threshold matters regarding these Agreements to an arbitrator. Plaintiff here has specifically challenged the delegation clause itself, and thus the Court may properly address these threshold questions.[22]

*Assuming arguendo* the presence of an agreement to arbitrate, Defendants' arguments concerning delegation nonetheless fail. Here, the Delegation Clause solely delegates the "scope

---

[21] Because Choice of Law is unresolved, Plaintiff applies both New York and Texas contract principles throughout his arguments. Both Texas and New York have similar law, but the most notable difference is the requirement of both procedural and substantive unconscionability under New York law.

[22] *Rent-A-Ctr. W., Inc.,* at 72.

and enforceability of ***this Arbitration Agreement***;" and "the interpretation, applicability, enforceability or formation of ***this Arbitration Agreement***." Nadler Decl., <u>Exhibit B</u> (emphasis added). Through its plain language, the Delegation Clause does not provide for interpretation of the Delegation Clause itself or the encompassing Terms of Use. In fact, the only mention of Terms of Use concerns an arbitrator's authority to award relief "under…these Terms of Use (including the Arbitration Agreement)" and specifies both agreements independently of each other. *Id*. Therefore, the Delegation Clause is not only not "clear and unmistakable" it is ambiguous and subject to multiple interpretations.

A plain language reading of the Clause suggests that, in light of the doctrine of separability, only the Arbitration Agreement is subject to the arbitral forum. In that same plain language reading, neither the April 2021 Terms nor the Delegation Clause itself are subject to interpretation by an arbitrator. Indeed, the Clause states it is within the Arbitrator's authority to interpret "any claim that all or part of ***this Arbitration Agreement*** is void or voidable." Nadler Decl., <u>Exhibit B,</u> (emphasis added). As explained, a Delegation Clause, under the doctrine of separability, must be read as a separate and separable antecedent agreement, and not part of the Arbitration Agreement as a whole.[23] Therefore, in light of these ambiguities, the Delegation Clause is not "clear and unmistakable", and this Court must construe such ambiguous provision against the drafter and must itself address the threshold issues.

**E.** **The April 2021 Terms and Arbitration Agreement embedded therein are Void and Unenforceable**

Because the Delegation Clause is not "clear and unmistakable" arguments concerning the validity and enforceability of the April 2021 Terms and Arbitration Agreement embedded therein

---

[23] *Id*.

are appropriate for resolution by the Court. In light of the Supreme Court's opinion in *Buckeye*, Plaintiff challenges the April 2021 Terms and Arbitration Agreement independently, however, addresses them together as the principles rendering both void unenforceable are the same.

## 1. Mutual Assent

As a threshold matter, the April 2021 Terms and Arbitration Agreement are unenforceable for lack of mutual assent. Plaintiff never agreed to the April 2021 Terms contained in Nadler Decl., <u>Exhibit B</u>, and as a result, it cannot be asserted that he ever agreed to any purported Arbitration Agreement contained therein. Defendants maintain that their internal corporate records show that Plaintiff assented to the April 2021 Terms when creating his Nifty Gateway Account. Nadler Decl., at 3 ¶ 11. However, there has been no such showing here. While Defendants claim to have these records, they fail to produce them and instead rely solely on inapplicable documents grabbed from the internet and attached to a Declaration from the Nifty Gateway "Manager of Trust and Safety." This is insufficient. The mere existence of an account now does not speak to whether an agreement to arbitrate was entered into and Plaintiff denies ever seeing any such agreement. Hastings Decl., at 2 ¶¶ 6 & 7. This is insufficient to show assent under either Texas or New York contract laws.

Texas provides the following requirements to form a valid contract: "(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding."[24] There can be no mutual assent or meeting of the minds—and hence no contract—if the one to whom the offer is supposedly made is unaware of the agreement's terms and conditions.[25] In addition, "[t]he offer must be clear

---

[24] *DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App. 2008).
[25] *Broadnax v. Ledbetter*, 100 Tex. 375, 377 (1907).

and definite just as there must be a clear and definite acceptance of all terms contained in the offer."[26]  Because Defendants have not demonstrated that Plaintiff was provided with adequate notice of these Agreements, they likewise cannot show mutual assent or a "meeting of the minds" as required under Texas law, and further fail to show Plaintiff's affirmative assent to any agreement at all.

Likewise, under New York law, to create a valid and binding contract, "there must be an offer, acceptance, consideration, mutual assent and intent to be bound."[27]  Stated differently, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."[28]  "[I]n the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that [they had] at least constructive knowledge of the terms of the agreement from which knowledge a court can infer acceptance."[29]

*Berkson v. Gogo LLC*, 97 F.Supp.3d 359 (E.D.N.Y. 2015), is particularly instructive to the facts here.  The court in *Berkson* explained that the defendant in that case "did not make an effort to draw [the plaintiff's] attention to its 'terms of use,'" and noted that the reader was not addressed in all caps, and there were no signifiers of importance such as the use of the word "important" or the phrase "please read."[30]  The court further noted that "[t]he hyperlink to the 'terms of use' was

---

[26] *Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 26 (Tex. App. 2005).
[27] *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2nd Cir. 2004) (internal citation and quotation marks omitted).
[28] *In Matter of Exp. Indus. and Terminal Corp.*, 93 N.Y.2d 584, 589 (1999).
[29] *Hines v. Overstock.com, Inc.*, 380 Fed.Appx. 22, 25 (2nd Cir. 2010); *see also Whitt v. Prosper Funding LLC*, 2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015); *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225, at *2 (S.D.N.Y. Apr. 24, 2014) (explaining that "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.").
[30] *Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 403-04 (E.D.N.Y. 2015).

not in large font, all caps, or in bold."[31]   This parallels what Defendants allege Plaintiff might have seen here—a user, seeing the sign-up screen in Nadler Decl. <u>Exhibit A</u>, was not addressed in all caps, nor were they called attention to any important words denoting the fact that the April 2021 Terms contained an Arbitration Agreement materially altering the judicial resolution of any claims.

Furthermore, the inapplicable March 2021 Sign-Up Page merely states, "by signing up, you agree to the Terms and Conditions and Privacy Policy."  It is entirely unreasonable to assume that a user signing up for online services would understand that by agreeing to a Terms of Use, they are also contracting their right to avail themselves of the traditional judicial forum in exchange for confidential arbitration.   Notwithstanding, Defendants have not shown Plaintiff received adequate notice of the Agreements or any of the material terms contained therein, and therefore, under both Texas and New York contract law, both Agreements necessarily fail for a lack of mutual assent.

### 2.     Illusoriness

Additionally, both the April 2021 Terms and Arbitration Agreement cannot be considered validly formed contracts for want of consideration under traditional contract principles concerning illusoriness.  Most often, contracts fail for illusoriness because they do not contain a mutuality of obligations or because one side retains a unilateral right to modify or even terminate the agreement as a whole.   Both the April 2021 Terms and Arbitration Agreement are illusory and thus unenforceable for a lack of consideration.

---

[31] *Id*. at 404.

Under Texas law, an arbitration agreement is illusory if a party to contract "can avoid its promise to arbitrate by amending the provision or terminating it altogether."[32] An illusory contract is considered to never have been formed because it lacks the necessary consideration—"Where no consideration exists, and is required, the lack of consideration results in no contract being formed."[33] In *National Federation of the Blind v. The Container Store, Inc*., 904 F.3d 70 (1st Cir. 2018), the First Circuit, applying Texas law, found a contract providing for one party's unilateral retention of rights to alter the terms of the agreement "at any time" as a textbook-example of illusoriness under Texas law. There, the First Circuit concluded that "because Texas law treats illusoriness as an issue regarding consideration needed to enter into a contract, the presence of an illusory agreement therefore indicates no agreement to arbitrate exists between the parties." *Id*.

Under New York law, a contract is unenforceable as illusory if it lacks a mutuality of obligation such that "one party gives as consideration a promise that is so insubstantial as to impose no obligation."[34]

The Arbitration Agreement itself, explains it "requires **you** to arbitrate disputes with Nifty Gateway and limits the manner in which **you** can seek relief from us." Nadler Decl., <u>Exhibit B</u>. Importantly, nowhere in the Arbitration Agreement does it state Nifty Gateway's relief from Plaintiff, and likewise situated consumers, would be limited. Moreover, throughout the Arbitration Agreement, the terms consistently state, "***You*** agree," insinuating that it is only the consumer who agrees to the terms and not specifically Nifty Gateway.

---

[32] *In re 24R, Inc*., 324 S.W.3d 564, 567 (Tex. 2010); *Nelson v. Watch House Int'l, LLC*, 815 F.3d 190, 193 (5th Cir. 2016).
[33] 3 Williston on Contracts § 7:11 (4th ed.).
[34] *Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co*., 28 N.Y.3d 675, 684 (2017).

First, the Arbitration Agreement is unenforceable as illusory because it requires the user to arbitrate all disputes but does not impose reciprocal obligation upon Nifty Gateway. While it does obligate both parties to "waiv[e] their right to trial by jury and to participate in a class action or class arbitration" the waiver does not preclude Defendant's ability to bring claims against Plaintiff or users in a judicial forum and only precludes Plaintiff from doing so. Nadler Decl., <u>Exhibit B</u>. Furthermore, the Arbitration Agreement "limits the manner in which [the user] can seek relief from [Nifty Gateway]." *Id*. Taken all together, under a plain language reading of the Arbitration Agreement, these terms require Plaintiff and users to blanketly forego their rights to a judicial forum, all while allowing Defendants to reap the benefits. This plainly lacks a mutuality of obligation under both Texas and New York law and renders the Arbitration Agreement unenforceable for a lack of consideration.

Likewise, the April 2021 Terms, Section 1 provides the following, "Nifty Gateway reserves the right change or modify these Terms of Use at any time and in our sole discretion." *Id*. Section 10 further provides that Defendants "may modify part or all of Nifty Gateway or the Services without notice." *Id*. Finally, Section 19 provides that Defendants "reserve the right, ***without notice and in our sole discretion***, to terminate your license to access or use the Site or Content, at any time and for any reason." *Id*. (emphasis added). Section 19 continues, "You understand and agree that ***we shall have no liability or obligation to you*** in such event." *Id*. (emphasis added).

As a result, the April 2021 Terms are unenforceable as illusory for similar, but decidedly more expansive, reasons. First, Defendants unquestionably retain a unilateral right to (1) modify the Terms of Use and Services provided "without notice," (2) terminate a user's account "at any time and for any reason," (3) suspend a user's account "in [their] sole discretion," and (3) retain all rights to a user's account. Nadler Decl., <u>Exhibit B</u>. Indeed Section 6 explicitly states: "you

understand and agree that you shall have no ownership or other property interest in your account, and you further agree that **all rights** in and to your account are and ***shall forever be owned and inure to the benefit of Nifty Gateway***." *Id*. (emphasis added). Furthermore, while retaining these significant abilities, Defendants likewise disclaims all warranties, completely limits their liability, and provides an expansive indemnification provision indemnifying themselves, but not the user in return, from "all actual or alleged third party claims, damages, awards, judgements, losses, liabilities, obligations, penalties, interest, fees, expenses…of every kind and nature whatsoever." *Id*. Through these provisions, Plaintiff and users are left with no judicial recourse, no recourse for Defendants' or others' liability, and no indemnification against any similar third party claims. At the same time, Defendants retain the ability to pursue claims in a judicial forum, and can essentially repossess Plaintiff's crypto assets and account, leaving Plaintiff with no value or compensation for their loss.

### 3. Unconscionability

Finally, both the April 2021 Terms and Arbitration Agreement are unenforceable due to unconscionability. The provisions contained in both Agreements are pervasively one-sided and subject Plaintiff, and likewise situated users, entirely to the whims of Defendants' decisions.

Under Texas law, unconscionable contracts are unenforceable. Unlike New York, Texas does not require both substantive and procedural unconscionability. A contract is substantively unconscionable if, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one sided that it is unconscionable under the circumstances existing when the parties made the contract."[35] In deciding the fairness of a

---

[35] *In re FirstMerit Bank,* 52 S.W. 3d 749, 757 (Tex. 2001).

contract's substantive terms, "the court must also consider whether there were 'procedural abuses,' such as an unfair bargaining position between the parties at the time the agreement was made."[36] In determining whether a contract is unconscionable, Texas law instructs examination of "(1) the 'entire atmosphere' in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the "non-bargaining ability" of one party; (4) whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable.[37]

Alternatively, in New York, "[a] determination of unconscionability generally requires a showing that the contract was **both** procedurally and substantively unconscionable when made."[38] Courts assess overall unconscionability by applying a "sliding scale" where "the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa."[39] Moreover, "Courts applying New York law have considered an opt-out provision as an important, if not dispositive, factor in rejecting [or in this case, accepting,] challenges of procedural unconscionability."[40] The Southern District of New York in *Lipsett v. Banco Popular N. Am*., 2022 WL 17547444 (S.D.N.Y. Dec. 9, 2022), found an amendment unconscionable because Plaintiff had no notice, and no meaningful and reasonable opportunity to

---

[36] *Tri-Continental Leasing Corp. v. Law Office of Richard W. Burns,* 710 S.W.2d 604, 609 (Tex. App. 1986).

[37] *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136 (Tex. App. 2005) (quoting *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex .Civ. App. 1975)).

[38] *David v. #1 Mktg. Serv., Inc*., 979 N.Y.S.2d 375 (N.Y. App. Div. 2d Dep't 2014) (emphasis added) (quoting *Simar Holding Corp. v. GSC*, 928 N.Y.S.2d 592, 595 (N.Y. App. Div. 2d Dep't 2011) (quotation omitted)).

[39] *Haft v. Haier US Appliance Solutions, Inc*., 578 F. Supp. 3d 436, 452 (S.D.N.Y. 2022) (citing *Shema Kolainu-Hear Our Voices v. ProviderSoft*, LLC, 832 F. Supp. 2d 194, 201 (E.D.N.Y. 2010) (quoting *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 2d Dep't 1983))).

[40] *Kai Peng v. Uber Techs. Inc*., 237 F. Supp. 3d 36, 55 (E.D.N.Y. 2017) (collecting cases).

opt out. This Court concluded, "The lack of notice and absolute lack of opportunity for [the party] to opt out render the [agreement] unconscionable under New York law, which seeks to ensure that the more powerful party—here, [Defendant]—cannot 'surprise the other party with some overly oppressive term, like an arbitration provision with an opt-out procedure that could never be exercised." *Id*., at *8 (internal quotation marks omitted) (quoting *Bank v. WorldCom, Inc*., 2002 WL 171629, at *2 (N.Y. Sup. Ct. Jan. 24, 2002) (citing *Matter of State of New York v. Avco Fin. Serv. N.Y., Inc*., 429 N.Y.S.2d 181, 185 (N.Y. 1980)).

Under both New York and Texas law, the April 2021 Terms and Arbitration Agreement embedded therein are both procedurally and substantively unconscionable. Procedural unconscionability is further evidenced through "surprise." The April 2021 Terms provides Defendants with a unilateral right to modify the Agreement's terms in their sole discretion and without any notice to users, including the Arbitration provision. Indeed, a cursory review of the most recent Terms of Use, dated December 27, 2022, now includes an agreement to arbitrate which provides for complete confidentiality and new material dispute resolution procedures. The mere fact that Defendants already *have already modified* material provisions without providing notice to current users is procedurally unconscionable. The Arbitration Agreement is also procedurally unconscionable by providing opportunity for Defendants to avail themselves of a judicial forum, while restricting the totality of any prospective Plaintiff's claims to an arbitral forum.

Importantly, in a novel industry—like the trade of cryptocurrencies and crypto assets—it is increasingly more important that the party with the most bargaining power be forthcoming with each users' rights and obligations. It is undisputed that a consumer's decision to waive their rights to proceed in a judicial forum is material, especially in representative actions like the securities class action here. Therefore, it is of the utmost importance that a consumer be given notice and an

opportunity to opt out if they determine compliance with a contract is overly oppressive. Indeed, Plaintiff here has exercised his right to opt out of Arbitration provisions on several occasions. Hastings Decl., at 2 ¶ 8.

Finally, the April 2021 Terms and Arbitration Agreement embedded therein are substantively unconscionable under both New York and Texas law. Substantive unconscionability is generally shown by an unequal bargaining power and one-sided provisions. The Arbitration Agreement "requires *you* to arbitrate disputes with Nifty Gateway and limits the manner in which *you* can seek relief from us." Nadler Decl., <u>Exhibit B</u>. As noted, these terms do not purport to bind Defendants to this same process. To subject a user to the terms of an Agreement that only apply to the user's conduct, as is the case in the Arbitration Agreement, or that provides the more powerful party with a unilateral right to make changes to or terminate the agreement, as is the case in the April 2021 Terms, is unduly oppressive, materially one-sided, and constitutes clear substantive unconscionability. Under Texas and New York law, the April 2021 Terms and Arbitration Agreement embedded therein are both unenforceable under the procedural and substantive unconscionability doctrines of both Texas and New York.

### F. Securities Class Actions Should Be Resolved By the Federal Court

Finally, the claims alleged here should be resolved in federal court as opposed to a confidential arbitrable forum under public policy concerns. Federal courts analyzing the enforceability of arbitration provisions relating to federal statutory claims, have noted that such contracts are not enforceable when a party is forced to "forgo the substantive rights afforded by the statute," as opposed to merely "submit[ting] to resolution in an arbitral, rather than a judicial,

forum."[41]  In the context of federal claims, either an expression of federal intent to exclude certain categories of claims from arbitration,[42] or the excessive waiver of statutory rights[43] may render a particular dispute un-arbitrable.  The latter is at issue here.

The nature of securities litigation particularly lends itself to class resolution.  When the PSLRA was enacted in 1995 against the backdrop of an overturned *Wilko v. Swan*, 346 U.S. 427 (1953), decision and the subsequent Shearson opinions, *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220 (1987) and *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989), Congress expressed its intent to guarantee investors the ability to litigate securities claims ***on a classwide basis*** in federal court.  As explained in its legislative history, the PSLRA's purpose was to "encourage the most capable representatives of the plaintiff class to participate in class action ***litigation***." H.R. Rep. No. 104-369, 104th Cong., 1st Sess., at 32 (1995) (emphasis added). Moreover, Congress expected that this practice will "assist courts by improving the quality of representation in securities class actions." *Id*.

Indeed, the Second Circuit itself affirmed this very notion in *Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 756 F.2d 230, 237 (2nd Cir. 1985), when it explained that the Congressional purpose for enacting the Securities Act was "to provide investors with material information and to protect the investing public from the sale of worthless securities through misrepresentation." (citing H.R. Rep. no. 85, 73d Cong., 1st Sess. 1-5 (1933)). Congress itself has confirmed this notion in the Legislative History to the PSLRA when it stated: "The overriding purpose of our Nation's securities laws is to protect investors and to maintain confidence in the

---

[41] *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc*., 473 U.S. 614, 628 (1985).
[42] *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp*., 500 U.S. 20, 26 (1991),
[43] *See, e.g.*, *Mitsubishi*, at 628.

securities markets, so that our national savings, capital formation, and investment may grow for the benefit of all Americans." H.R. Rep. no. 104-369, 104th Cong., 1st Sess., at 31 (1995). Finally, Congress also evinced strong preference for private securities litigation by stating:

> Private securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely upon government actions. Such private lawsuits promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs.

*Id.*

Arbitral resolution is complicated when discussing the precarious nature of investment contracts and the growing Crypto-Asset industry. Crypto-Assets and the legal claims arising therefrom are a new frontier of law, yet to be formally decided by the courts. As a result of this developing field and the lack of clear legal boundaries to informing an arbitral decision, resolution of these matters is particularly unfit for the arbitral forum.

These novel issues have a very real potential for competing decisions from arbitrators which would be incredibly complicated and misleading for investors to navigate. This is further compounded given the private nature of arbitration proceedings. Although arbitration is a sufficient vehicle for the quick and efficient resolution of some well-settled legal matters, it does not function the same on matters of first, or very nearly first, impression for the court. In those cases, and especially here, it seems particularly fitting to resolve such novel issues through the judicial process to ensure a clear precedent to guide future cases involving similar issues.

Nifties are securities that must be registered with the U.S. Securities and Exchange Commission ("SEC") and comply with federal securities laws. These requirements are in place to protect the integrity of the markets and the assets of main street investors – ordinary people who are investing their life savings in novel and new assets. Respectfully, whether that protection is

afforded must not be made piecemeal – investor by investor – and inconsistently determined by multiple arbitrators under the cloak of private arbitrations.

## IV.    **CONCLUSION**

In sum, Defendants failed to show that any agreement binding Plaintiff to arbitration existed or was known to the Plaintiff when he created his account.  This alone precludes an order compelling arbitration.  Moreover, Defendants' inability to show, at the very least, inquiry notice causes the Agreements to fail for lack of mutual assent.  Additionally, the illusory nature of the 2021 April Terms and Arbitration Agreement embedded therein causes both to fail for want of consideration.  Notwithstanding their inapplicability to Plaintiff, the agreements are nonetheless unenforceable under principles of unconscionability as the Agreements are both procedurally and substantively unconscionable as one-sided, restricting only Plaintiff to an arbitral forum while Defendants may proceed in federal courts.  Finally, the claims at issue in this case are unsuitable for an arbitral forum as Congress has set forth its intent, under the PSLRA, that private securities litigation be held in federal courts.

For the foregoing reasons, Plaintiff respectfully requests an order denying Defendants' Motion to Compel Arbitration, finding the 2021 April Terms and Arbitration Agreement and the Delegation Clause embedded therein void, unenforceable, and inapplicable, and maintaining this action in federal court.

Dated: March 29, 2023                              Respectfully Submitted,

                                                   **Herman Jones, LLP**

                                                   */s/ Serina M. Vash*
                                                   Serina M. Vash
                                                   (NY Bar No. 2773448)
                                                   153 Central Avenue, # 131

Westfield, New Jersey 07090
svash@hermanjones.com
404-504-6516

Of Counsel:
John C. Herman
*Admitted pro hac vice*
Herman Jones, LLP
3424 Peachtree Road, Suite 1650
Atlanta, Georgia 30326
jherman@hermanjones.com
404-504-6500